**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERTZ GLOBAL HOLDINGS, INC.,

Plaintiff

- against –

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, and U.S.
SPECIALTY INSURANCE COMPANY,

Defendants.

Case No.: 1:19-cv-06957

ECF CASE

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, by its attorneys, alleges the following:

## NATURE OF THE CASE

1.      Hertz Global Holdings, Inc. (herein, "Hertz"), brings this action against National Union Fire Insurance Company of Pittsburgh, Pa. (herein, "National Union") and U.S. Specialty Insurance Company (herein, "U.S. Specialty," and together with National Union, the "Insurers" or "Defendants") following their wrongful refusal to honor, respectively, an Executive and Organization Liability Insurance Policy (the "Primary Policy") issued by National Union, and an excess insurance policy (the "Excess Policy") issued by U.S. Specialty, the two policies collectively referred to as the "Policies").  The matters for which Hertz has sought, and been refused, payment under the Policies, include legal fees and expenses previously incurred in connection with an investigation by the U.S. Securities and Exchange Commission (herein, the "SEC") regarding Hertz's financial statements for the years 2011, 2012 and 2013 and  has  now been  settled  as  against  the  company.  Hertz hereby also seeks (i) declaratory relief as

to future expenses to be incurred in connection with the continuing SEC investigation involving former senior executives which, upon information and belief, include, at a minimum, ██████████████, who are insureds under the Policies and on whose behalf Hertz has paid, and continues to pay, legal fees and expenses, (ii) declaratory relief concerning a payment made to the SEC in connection with a consent order finding violations of the federal securities laws, and (iii) damages, recoverable by law for the Insurers' bad faith denial of the requested coverage under the Policies.

**PARTIES**

2.      Plaintiff Hertz is a Delaware corporation with its principal place of business at 8501 Williams Road, Estero, Florida.

3.      Upon information and belief, Defendant National Union is an insurance company organized under the laws of Pennsylvania with its principal place of business in New York, New York at 175 Water Street.

4.      Upon information and belief, Defendant U.S. Specialty is a Texas Corporation engaged in the insurance business, with its principal place of business in Houston, Texas, which is duly licensed by the New York State Department of Financial Services of the State of New York to transact insurance business in the State of New York, and regularly conducts business in New York in this District.

**JURISDICTION AND VENUE**

5.      The Court has jurisdiction over the claim asserted herein pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and

costs.

6.      This Court has jurisdiction over Defendants because, *inter alia*, National Union has its principal place of business in New York, and U.S. Specialty regularly conducts business in the State of New York.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendants either actually reside in this District, or are deemed to do so (per 28 U.S.C. § 1391(d), as a result of sufficient contacts with this District). Alternatively, in  the event that U.S. Specialty's contacts with this District were not deemed sufficient under 28 U.S.C. § 1391(d), then venue would still be proper pursuant to 28 U.S.C. § 1391(b)(3) (based on Defendant National Union's residing in this District).

## MATERIAL FACTS

8.      On or about November 16, 2013, National Union issued to Hertz the Primary Policy, bearing number 01-592-47-41 (the "Primary Policy"), in the amount of $15 million, subject to a (self-insured) retention of $5 million and a sublimit for "Cost of Investigation" coverage of $2 million. The Primary Policy is a "claims made" policy which has been renewed and remains in force and effect on the date hereof.

9.      On or about November 16, 2013, U.S. Specialty issued the Excess Policy, bearing number 24-MGU-13-A30654, which provides an additional (second) $15 million layer of insurance coverage for claims made and paid under the National Union Primary Policy (after National Union's $15 million coverage has been exhausted). The Excess Policy is also a "claims made" policy which generally follows the terms of the Primary Policy, to wit, a *follow form* policy, and has been renewed and remains in force and effect on the date hereof.

10.    In connection with the matters that are the subject of this action, all conditions to filing this lawsuit have been satisfied.  Specifically, any requirement under the Policies for alternative dispute resolution has been satisfied, as a mediation was conducted in March of 2019 which addressed all of the matters that are the subject of this lawsuit (and which resulted in a bad faith final offer from Defendants with respect to all issues and claims in this action).

### Fees and other Costs Previously Incurred per the SEC Investigation

11.    On or about July 10, 2014, Hertz provided Insurers notice of an inquiry by the SEC relating to Hertz's financial statements for the years 2011, 2012 and 2013.

12.    On or about July 28, 2014, National Union acknowledged receipt of the July 10, 2014 notice and stated, *inter alia,* as follows:

> " . . . . the SEC Inquiry is made solely to the Company. As such, it is not a Claim or a Securities Claim. Therefore, the fees and expenses incurred responding to those matters do not qualify as Defense Costs and will not be credited towards the Retention."

13.    By letter of January 8, 2015, U.S. Specialty, via its "Claims Administrator," effectively adopted National Union's denial of coverage, as alleged in Paragraph 12, above.

14.    On September 8, 2014, the SEC issued an "ORDER DIRECTING PRIVATE INVESTIGATION AND DESIGNATING OFFICERS TO TAKE TESTIMONY in "the Matter of *Hertz Global Holdings, Inc.*" (the "Order").  That Order specifically stated that the SEC has "information that tends to show" multiple possible violations by Hertz of various provisions of the federal securities laws and rules.  (A true and accurate copy of the Order is attached as **Exhibit A** to, and incorporated by reference in, this Amended Complaint.)

15.     The effect of the SEC's Order was that if Hertz and witnesses did not accede to the SEC's demands, including extensive document requests and a plethora of interviews of various witnesses and others, including Hertz executives and accountants, the SEC would have exacted compliance with subpoenas authorized by the Order.

16.     Pursuant to the Order, the SEC has issued one or more subpoenas to witnesses who have declined voluntary requests for information and/or testimony in connection with the investigation.

17.     Hertz was required to expend millions of dollars in its defense of the interviews and related SEC demands, including paying the fees and costs of employees, former employees, including former senior executives, at least two of whom remain under investigation, accountants, and consultants, all of whom retained separate counsel.

18.     During discussions with Hertz, the SEC made clear that Hertz would be subject to a Wells notice and enforcement action for violations of U.S. securities laws. Ultimately, a settlement was proposed which would require the payment of $16,000,000 pursuant to a consent order finding violations of the federal securities laws (the "Consent Order"), and that would also preclude Hertz from seeking reimbursement from the Insurers.

19.     The Consent Order, however, does not preclude an acknowledgment of coverage for either the fees and expenses incurred in defense of the SEC formal investigation, or the negotiation of that order.  (A true and accurate copy of the Consent Order is attached as **Exhibit B** to, and incorporated by reference in, this Amended Complaint.)

20.     As the Insurers knew at the time, but for the settlement, the SEC would have filed a Wells notice, followed by the filing in court of a complaint for violations of the federal securities laws, which would seek, *inter alia,* penalties far exceeding the amount of the settlement.

21.     As a result of the Order the SEC issued in 2014 and subsequent events, as detailed above, the SEC investigation and other governmental investigations constituted administrative or regulatory proceedings under the Policies requiring coverage by the Insurers.

22.     In or about October 2018, Hertz met with representatives of National Union to discuss the status of the SEC investigation, a possible settlement with the SEC, and reimbursement of the substantial amounts paid by Hertz in defense of the SEC investigation. Also in attendance were representatives of Hertz's insurance broker. Representatives for Hertz advocated its position that defense fees and costs, as well as any penalty, were covered. Nevertheless, National Union subsequently reaffirmed its "no coverage" position for both defense fees and costs and for any penalty imposed by the SEC, a position concurred in by U.S. Specialty.

23.     By reason of the Insurers' position, Hertz found itself in an untenable position, because if Hertz did not settle with the SEC, it could face the prospect of a penalty imposed by the Court after an unsuccessful trial of a securities fraud enforcement action – which penalty could well exceed the $16 million the SEC was apparently willing to settle for at that time.

24.     When Hertz received no written definitive response from National Union, Hertz sent each Defendant, on December 10, 2018, a letter which stated, *inter alia*, that

the July 28, 2014 denial of coverage (on the purported ground that "the SEC Inquiry is made solely to the Company" and "[a]s such, it is not a Claim or a Securities Claim") was wrongful and inconsistent with the terms of the Policies, inasmuch as the definition of a "Securities Claim" acknowledges that "[n]otwithstanding the foregoing, the term 'Securities Claim' shall include an administrative or regulatory proceeding against an Organization" – which is what the SEC investigation comprised.

25. By letters of December 13 and 17, 2018, National Union and U.S. Specialty, respectively, again denied coverage for Hertz's SEC fees and defense costs – *not* on their prior stated basis that the definition of a Securities Claim does not include a claim against "the Company," but contending instead that the SEC investigation did not constitute an "administrative proceeding."

26. The Insurers' argument, as stated above, was disingenuous and not made in good faith, because, as they know, even in a so-called "informal" SEC "inquiry," the failure to cooperate and affirmatively respond to the SEC's requests will be met by the issuance of subpoenas, pursuant to a formal order. In short, the Insurers, looking for new ways to deny coverage, concocted a bogus distinction between an "administrative or regulatory proceeding" (which they do not deny is covered under the Policies) and the SEC's four-year investigation of Hertz.

27. Moreover, any claim by the Insurers that they should have been kept expressly informed by Hertz of developments in the SEC investigation, notwithstanding their flat out denial of coverage, and notwithstanding that they were well aware of the SEC's investigation through public filings and their knowledge of related parallel class derivative action for which the Insurers acknowledged coverage, would be disingenuous

and another manifestation of bad faith.

28.    In view of their prior position, the Insurers are estopped from asserting as a defense to coverage that the SEC investigation was not an administrative or regulatory proceeding, and their attempt to do so is a manifestation of bad faith.

29.    From 2014 to December 31, 2018 Hertz expended in excess of $23,000,000 in attorneys' fees and expenses on its own behalf and on the attorneys' fees and expenses on behalf of current and former officers, agents, employees, and consultants in connection with the SEC and other governmental investigations.

**Future Fees and other Costs to be Incurred per the SEC Investigation**

30.    And, the amount spent in connection with such investigations will continue as, upon information and belief, the SEC is continuing to proceed with its investigation against one or more former officers of Hertz, including but not limited to ███████████████████████, whose respective counsel continues to forward invoices to Hertz for payment in connection with that investigation.

31.    The insurers also refuse to acknowledge coverage for any such additional amounts to be expended by Hertz in the future, which refusal presents a definite and concrete, and otherwise judiciable, controversy.

**The SEC Settlement/Penalty**

32.    In connection with the SEC investigation, on December 31, 2018 Hertz entered into a settlement agreement with the SEC, which provided for a penalty to be paid in the amount of $16 million as a result of the SEC's Consent Order finding violations of the federal securities laws, which Hertz paid.

33.    Although Hertz's settlement agreement with the SEC (currently)

prohibits Hertz from recovering from its insurance carriers the $16 million Hertz paid, National Union and U.S. Specialty – neither of which is a party to that settlement agreement or a third-party beneficiary of it, or negotiated it, or otherwise has any standing to enforce any such restriction – are nonetheless required to acknowledge coverage of the $16 million penalty.

34.    In January 2019, Hertz requested from National Union and U.S. Specialty confirmation of coverage under the Policy for the $16 million settlement amount Hertz paid.

35.    Both Insurers again declined to acknowledge coverage, wrongly contending that civil penalties are excluded from the definition of "Loss" under the Policies, and that New York and New Jersey law preclude insurance coverage for penalties – when in fact they knew that Plaintiff is entitled under the Policies to invoke Delaware law, Hertz's state of incorporation, which does permit coverage for such penalties.

36.    Nor could the Insurers now contend in good faith that the $16 million does not arise from a "Securities Claim," as they know that had Hertz refused to pay it, the result would have been a lawsuit by the SEC, and penalties sought for more than $16 million, each of which indisputably would be covered under the Policies.

37.    The insurers' refusal to now acknowledge coverage for the $16 million Hertz paid represents a definite and concrete, and otherwise judiciable, controversy.  A justiciable case or controversy also exists as a result of Defendants' denial of coverage, not only for the $16 million Hertz paid by the SEC, but due to their effective denial of coverage for *any* penalty that might be imposed by a court in a civil enforcement action

that would have resulted but for that payment. Thus, that bad-faith denial of any coverage caused Hertz to enter into the Consent Order with the SEC, rather than risk the potentially catastrophic adverse financial consequences of an SEC enforcement action.

## AS AND FOR THE FIRST CAUSE OF ACTION

**(Breach of Contract by National Union
Concerning the SEC Investigation Defense Costs)**

38.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

39.     The Primary Policy constitutes a valid and binding contract between Plaintiff and National Union, and imposes a duty on National Union pay or reimburse Hertz for the attorneys' fees and expenses incurred in defense of the SEC investigation.

40.     Plaintiff has timely paid all premiums required under the Primary Policy, and has otherwise fully performed under that contract.

41.     National Union has breached its obligations under the Primary Policy by refusing to reimburse Hertz thereunder for that portion of the defense fees and costs (amounting to over $23 million) within the available policy limit, which were incurred and paid in defending Hertz against, and otherwise responding to the SEC investigation.

## AS AND FOR THE SECOND CAUSE OF ACTION

**(Breach of Contract by U.S. Specialty
Concerning the SEC Investigation Defense Costs)**

42.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

43.     The Excess Policy constitutes a valid and binding contract between

Plaintiff and U.S. Specialty, and it imposes a duty on U.S. Specialty to pay or reimburse Hertz for the attorneys' fees and expenses incurred in defense of the SEC investigation.

44.     Plaintiff has timely paid all premiums required under the Excess Policy, and has otherwise fully performed under that contract.

45.     U.S. Specialty has breached its obligations under the Excess Policy by refusing to reimburse Hertz thereunder for any portion of the defense fees and costs (amounting to over $23 million) which were incurred and paid in defending Hertz against, and otherwise responding to the SEC investigation.

46.     Plaintiff has been damaged by U.S. Specialty's breach in the amount of such defense fees and costs in excess of the available limit of the Primary Policy.

## AS AND FOR THE THIRD CAUSE OF ACTION

**(Declaratory Judgment concerning the SEC Settlement Amount/Penalty and Continuing SEC Investigation of Former Officers of Hertz and Affiliates)**

47.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

48.     As described above, Defendants' conduct concerning the $16 million penalty Hertz paid to the SEC, raises an actual and justiciable controversy, which entitles Plaintiff to a declaration that it is entitled to indemnification from Defendants under the Policies concerning that paid liability, if and when a claim for such amounts is properly submitted to Insurers.

49.     Upon information and  belief, the SEC is continuing to proceed with its investigation of one or more former officers of Hertz, including but not limited to ███, ███████████████, and so Defendants are required to reimburse Hertz not just

for any invoices it has already received and paid as part of the over-$23 million amount for which coverage from the Insurers has already been sought, but also for any future invoices received from counsel for those former officers in connection with those investigations.

50.    As alleged above, the March 2019 mediation effectively covered not just the prior amounts paid by Hertz, but also such amounts to be paid in the future, and it was unsuccessful in resolving this dispute.

51.    As such, the continuing SEC investigation raises actual and justiciable controversies, which entitle Plaintiff to a declaration that it is entitled to indemnification from Defendants under the Policies concerning those paid and continuing liabilities.

## AS AND FOR THE FOURTH CAUSE OF ACTION

### (Bad Faith Denial of Coverage)

52.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

53.    As described above, Defendants' have refused to reimburse Hertz for amounts already paid, or to be paid in the future, to its former officers' counsel, and refused to acknowledge coverage of the $16 million penalty Hertz paid to the SEC.

54.    Defendants' refusals to provide the requested coverage were not fairly debatable, and otherwise constitute denials of insurance coverage made in bad faith, as they know, among other things, that coverage of amounts expended by Hertz's current and/or former employees and others on their own counsel in connection with the governmental investigations is actually required by the Policies.  Moreover, Defendants' refusal to acknowledge coverage of the settlement penalty, or any penalty imposed by a

Court in the event of no settlement, improperly forced Hertz to give up its defense of the SEC's allegations that Hertz had violated the federal securities laws.

55.     As a result of Defendants' bad faith denials of coverage, Hertz is entitled to all damages recoverable under law, including without limitation, attorneys fees.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, as follows:

i.      Judgment for Plaintiff against Defendants (on the first and second causes of action) for amounts paid by Hertz in connection with the subject investigations, up to the  remaining dollar coverage limits of the Policies;

ii.     Declaratory Judgment declaring Plaintiff's right to coverage under the Policies for the $16 million amount paid to the SEC;

iii.    Declaratory Judgment declaring Plaintiff's right to future reimbursement of legal fees and costs incurred in connection with the continuing SEC investigation of former officers of Hertz and affiliates;

iv.     Judgment for Plaintiff against Defendants on its fourth cause of action, and awarding Hertz damages, including without limitation, attorneys fees; and

v.    All other, further and different relief as the Court deems just and proper.

Dated:  December 2, 2019

                                LAW OFFICES OF HERBERT BEIGEL

                                 By: /s/ Herbert Beigel
                                 5641 N. Chieftan Trail
                                 Tucson, AZ 85750
                                 520-825-1995
                                 hbeigel@me.com

                                    -and-

                                 LAW OFFICE OF ROBERT R. VIDUCICH
                                 Robert R. Viducich
                                 40 Wall Street, 28th Floor
                                 New York, New York 10005
                                 Tel: (212) 400-7135
                                 rviducich@rrvlaw.com